Washington, J.,
 

 delivered the opinion of the court: — This vessel was the property of Samuel G. Griffith, an American citizen. On or about the 24th of September 1812, she sailed, with a cargo of flour and bread, from Baltimore to Lisbon ; and on her voyage thither, was captured, on the 15th of October following, by the privateer brig Thorn, and brought into the district of Massachusetts, where she and her cargo were libelled as being enemies’ property.
 

 The brig was claimed by the master, in behalf of Griffith, and the cargo, by the supercargo, as belonging to the said Griffith, and other shippers, being American merchants of Baltimore. Among the papers found on board of this vessel, at the time of the capture, was a letter from Admiral Sawyer, dated the 5th of August 1812, addressed to Andrew Allen, jun., as British consul for the states of Massachusetts, New Hampshire, Rhode Island and Connecticut, which states, that, being aware of the importance of insuring a constant supply of flour and other dry provisions to Spain and Portugal, and to the West Indies, he should give directions to the commanders of his majesty’s squadron under his command, not to molest American vessels, unarmed, and so laden,
 
 bond fide
 
 bound to Portuguese or Spanish ports, whose papers should be accompanied with a certified copy of ■that letter, under the consular seal of the said Allen ; also a letter from the said Allen, dated 15th September 1812, addressed to all the officers of his majesty’s ships of war, or privateers belonging to subjects of his majesty, reciting that it is of vital importance to continue a full and regular supply of flour and other dry provisions to the ports of Spain and Portugal, or their colonies, and that, in consequence thereof, it has been thought expedient by his majesty’s government, that every degree of protection and encouragement should be given to American vessels so laden, and bound to the ports of Spain and Portugal, or their colonies, and that, in furtherance of these views of his majesty’s government, Admiral Sawyer had directed to him a letter, dated the 5th of August 1812 (a copy of which is annexed),
 
 *284
 
 with instructions to furnish American vessels, so laden and destined, *with a copy of his letter certified under his, the said Allen’s, consular seal, which documents are intended to serve as a perfect safe-guard and protection to such vessel in the prosecution of her voyage ; and that, in compliance with such instructions, he has granted to the American brig Hiram, whereof John B. Barker is master, now lying in the port of Baltimore, and laden with flour and bread, bound
 
 bond fide
 
 to Lisbon, a copy of the said Admiral Sawyer’s letter, certified under his consular seal, requesting all officers of his majesty’s ships of war, or of private armed vessels belonging to subjects of his majesty, not to offer any molestation to the said vessel, but, on the contrary, to grant her all proper assistance and protection on her passage to Lisbon, and on her return from thence to her port of departure, laden with salt, or in ballast only.
 

 Under an order calling upon the different claimants to give further proof relative to the British license found on board the brig, when and where it was obtained, of whom, and by whom, and on what terms, and, generally, relative to all facts and circumstances concerning the procurement of the same, William Hartshorn made an affidavit, stating that he purchased for Mr. Griffith, the owner of the vessel, in September 1812, from John R. Waddy, of Virginia, but then in Baltimore, a citizen of the United States, a license to protect a vessel laden with provisions and bound to Lisbon, from capture by British cruizers, for which ho was to pay one dollar per barrel for what the vessel would carry, payable, $500 in cash, and the balance on the safe arrival of the vessel at Lisbon : that the said license was in blank, for inserting the names of any vessel and master : and that the blanks in the said license were filled up in his presence. This witness, as well as others, states that these licenses form'an article of traffic in market, as much so as flour.
 

 The vessel and earg-o were acquitted in the district court, and a
 
 pro for md
 
 decree of affirmance made in the circuit court; from which decree, an appeal to this court was taken.
 

 In the case of
 
 The
 
 Julia, decided at this court, it was laid down in general terms, “that the sailing on a voyage, under the license and passport of protection of the *enemy, in furtherance of his views or interests, constitutes such an act of illegality as subjects the ship and cargo to *- confiscation as prize of war ; ” and as explanatory of the general reasons for that opinion, a reference was made to the opinion of the learned judge who-decided that case in the circuit court. It is contended by the counsel for the claimants, that the facts in this case differ so materially from those which appear in the case of
 
 The
 
 Julia, that the principles of law which ruled that case are inapplicable to this, and, consequently, ought not to govern the decision of the court upon it.
 

 There certainly are some differences in the two cases ; and these were considered sufficiently strong by the district judge who acquitted this vessel and cargo, to condemn the Julia and her cargo. The important circumstance which appears to have influenced the decision of the district judge in that case, was, that the license contemplated the means of insuring a constant supply of dry provisions to the allied armies in Spain and Portugal, and consequently, an unlawful connection with the enemy to supply his armies, and a subserviency to the interests of that enemy. In this case, no
 
 *285
 
 such views are expressed in the license of Admiral Sawyer ; yet the court; must be wilfully blind, not to see that this was, in reality, the object of Admiral Sawyer and of Mr. Allen, and that it must have been so understood by those who sailed under this license.
 

 In both cases, the allied armies were to be supplied, not by sales made directly to their agents (for this is not required by either), but by carrying supplies to the Peninsula, which would indirectly come to their use. The license, as well as the letter of Allen accompanying it, points out the great importance of such supplies being sent to Spain and Portugal ; and the latter adds, that, in furtherance of these views of his majesty’s government, he had been directed by Admiral Sawyer to furnish a copy of his letter to vessels so laden and destined. Can it be said, that an American citizen, sailing under the protection of papers professing such to be the views of the British .¡, _ government, does not act in such a manner as to subserve *the views -I and interests of the enemy ? Upon the whole, the court is of opinion, that there is no substantial difference between this case and that of
 
 The Julia;
 
 and that this is fully within the principle laid down by this court in deciding that case, and the reasoning to which it refers.
 

 It was stated on the behalf of the claimants of the cargo, that they ought not to be affected by the illegal act of the owner of the vessel, in sailing under the protection of this license. It is a sufficient answer to this argument, to observe, that, in this case, the court must presume that the license was known to the owners of the cargo, if it was not the joint property of all. It is inconceivable, that the owner of the vessel should expend about $1600 for the protection of a cargo, in which it appears he was not largely concerned, without communicating such an advantage to his shippers, and even requiring some reimbursement, either by demanding higher freight, or compensation in some other way. But what is conclusive on this point, is, that an order for further proof in relation to this license was made, and yet no affidavit or proof is offered by any of the owners, denying a knowledge of these documents being on board. The decree must be reversed, and the vessel and cargo condemned to the captors as prize of war.
 

 Decree reversed.