*Clarke,* for the defendant in error, insisted that this award having been regularly made, could be set aside only for corruption or misbehaviour in the arbitrators, or for a clear mistake of law. *Tittenson* v. *Peat,* 3 *Atk.* 529. *Parker* v. *Avery, Kirb.* 353.

---

BULKLEY and others *against* THE DERBY FISHING COMPANY.

THIS was an action on a policy of insurance, effected, during the late war between the *United States* and *Great-Britain,* on the ship *Charles,* from *New-York* to *St. Bartholomews,* with a warranty that she should be furnished with a passport from Admiral *Sawyer* in the usual form. The declaration averred, that the plaintiffs had an interest in the ship to more than the amount covered by the policy; and alleged a loss on the high seas from capture, by the enemies of our country.

On the trial, the plaintiffs read in evidence the policy, which corresponded with the declaration; a copy of the ship's register, and two depositions, from which it appeared that two of the plaintiffs were owners of the ship, and that

*Hartford,* June, 1816.

Allen *v.* Ranney.

Where two of several plaintiffs in an action on a policy of insurance on a vessel, were owners of the vessel insured, and all were in co-partnership, and joint owners of the cargo; it was held, that a sufficient interest in the plaintiffs

*Hartford,*
*June, 1816.*

was shewn to enable them to sustain the action.

A vessel was insured from *New-York* to *St. Bartholomews,* during the late war between the *United States* and *Great-Britain,* with a warranty that she should be furnished with a licence from Admiral *Sawyer* in the usual form. The supercargo testified, that he saw a licence from Admiral *Sawyer* on board ; that he had seen a number of them ; and this was in the usual form. Held, that this was sufficient evidence, that the vessel insured had on board a licence from Admiral *Sawyer.*

they were all in co-partnership, and joint owners of the cargo ; a copy of the sentence of condemnation, proving that the *Charles* was taken by His Britanic Majesty's ship *Tribune,* and carried in and condemned ; and a copy of the notice of abandonment. The plaintiffs also offered *Stephen Miller,* as a witness, to prove that the ship was furnished with a licence according to the stipulations in the policy. The counsel for the defendants objected to the admission of the evidence offered. They contended, that *Miller* could not be permitted to testify as to the existence or form of the licence ; but the plaintiffs were bound to produce a copy from the court of admiralty, or prove that they had attempted to get such copy, and had failed. The court overruled the objection, and admitted the evidence. *Miller* testified, that he was on board as supercargo, when the ship was taken. She had a licence from Admiral *Sawyer,* issued by the *Spanish* minister, Don *Onis ;* and it was, as he thought, in the usual form. He had seen several. The licence was under the seal of the *Spanish* minister. It was taken by the captain and carried into court, and has ever since been withheld. The captors, and the *British* court of admiralty, admitted that the licence was genuine, but denied Admiral *Sawyer's* authority to issue it. He had taken a copy of the licence, which he produced. It was as follows.

It appeared, that such licence was a copy of letter from Admiral *Sawyer* to the *Spanish* minister resident in the *United States,* in these words : " I will give directions to the commanders of His Majesty's squadron on this station, not to molest *American* vessels, or others under neutral flags, unarmed, and laden with flour and other dry provisions, *bona fide* bound to *Portuguese* or *Spanish* ports, whose papers shall be accompanied with a certified copy of this letter from your Excellency, with your seal affixed or imprinted thereon ; which, I doubt not, will be respected by all." This was certified by the *Spanish* minister as follows : " I certify that the preceding letter is an exact copy of the letter addressed to me by His Britanic Majesty's Vice-Admiral *H. Sawyer,* the original remaining in my possession ; and that it may so appear when convenient, I have granted this document to *George E. Avery,* captain of the *American* ship *Charles,* of 232 tons, which sails from the port of *New-York* for *Porto-Rico,* with a cargo of stores and provisions : and I solicit the Admiral of His Britanic Majesty on that station, and other marine officers, that taking into consideration the necessity of encouraging and protecting these expeditions, to encourage the merchants to continue them, will be pleased to enclose this document, and permit the aforesaid vessel to return safe to this country. Given under my hand and seal, in *Philadelphia,* this 13th *November,* 1812. [ *L. S.* ]  *Luis de Onis.*"  The cargo of the vessel insured consisted principally of flour, but there was also on board some beef, pork and candles. Held 1st, that the acceptance of such a licence, by the insured, for the voyage in question, was not illegal, and did not vacate the policy. But, 2dly, that the fair construction of the warranty being that such a licence from Admiral *Sawyer* should be furnished as should purport to protect the vessel and cargo for the voyage, the licence furnished will not be deemed a compliance with the warranty, unless it be further shewn, that there was no other form of licence from Admiral *Sawyer,* and that according to the usage of merchants, such licence was the only one required, whatever might be the cargo ; or that the insurers had knowledge of the cargo put on board.

*Hartford,*
June, 1816.

Bulkley
*v.*
Derby
Fishing
Company.

" Copy of a letter from His Excellency *H. Sawyer*, His Britannic Majesty's Vice-Admiral on the *Halifax* station, to His Excellency the *Chevalier de Onis*, His Catholic Majesty's Envoy Extraordinary and Minister Plenipotentiary near the *United States* of *America*.

" *His Majesty's ship* Centurion,
*at* Halifax, *the* 10th *of* August, 1812.

" Excellent Sir, I have the honour to acknowledge the receipt of Your Excellency's letter of the 26th *ultimo*, and have fully considered the subject of it, as being of the greatest importance to the best interests of *Great-Britain*, and those of His Catholic Majesty, *Ferdinand* the Seventh, and his faithful subjects ; and in reply, I have great satisfaction in informing Your Excellency, that I will give directions to the commanders of His Majesty's squadron on this station, not to molest *American* vessels, or others under neutral flags, unarmed, and laden *with flour and other dry provisions, bona fide* bound to *Potuguese* or *Spanish* ports, whose papers shall be accompanied with a certified copy of this letter from Your Excellency, with your seal affixed or imprinted thereon ; which, I doubt not, will be respected by all.

" I beg leave to assure Your Excellency of the high consideration, with which I have the honour to be

" Your Excellency's most obedient, humble servant,

" *H. Sawyer*, Vice-Admiral."

This writing was certified as follows.

" His Excellency, Don *Luis de Onis, Gonzalez Lopez y Vara*, His Most Catholic Majesty's Envoy Extraordinary and Minister Plenipotentiary to the *United States*, &c. &c. &c.

" *Philadelphia*.

" Don *Luis de Onis, Gonzalez Lopez y Vara*, Lord of the village of *Ryares*, that of *Macadina* and *Lagartina, Prussian* Knight of the royal and distinguished *Spanish* order of *Charles* the Third, Vocal Minister of the Supreme Assembly of the same royal order, Counsellor of His Catholic Majesty *Ferdinand* the Seventh, his Secretary to execute his decrees, his Envoy Extraordinary and Minister Plenipotentiary near the *United States* of *America*, &c. &c. &c.

" I certify, that the preceding letter is an exact copy of the letter addressed to me, by his Britannic Majesty's Vice-Admiral *H. Sawyer*, the original remaining in my possession ; and that it may so appear when convenient, I have granted

*Hartford,*
*June, 1816.*

Bulkley
*v.*
Derby
Fishing
Company.

granted this document to *George E. Avery,* Captain of the *American* ship *Charles,* 232 tons, which sails from the port of *New-York* for *Porto-Rico,* with a cargo of stores and provisions ; and I solicit the Admiral of His Britanic Majesty on that station, and other marine officers, that taking into consideration the necessity of encouraging and protecting these expeditions, to encourage the merchants to continue them, will be pleased to enclose this document, and permit the aforesaid vessel to return safe to this country. Given under my hand and seal, in *Philadelphia,* this 13th *November,* 1812.

[L. S.]                                                           *Luis de Onis.*"

*Miller* further testified, that the cargo was on freight, and consisted principally of flour, but that there was on board some beef, pork and candles.

By agreement of the parties, the cause was taken from the jury, and continued to the next term, that the points of law arising in the case might be submitted, in the meantime, to the consideration of the nine Judges. It was also agreed, that if either party should wish, after such points had been considered and decided, to make further proof, on another trial to a jury, they should have right to do so ; otherwise the superior court, at the next term, should settle the loss.

*N. Smith* and *Bristol,* for the defendants, urged the following objections to the plaintiffs' recovery. 1. That some of the plaintiffs had no interest in the subject of insurance. If this action could be sustained, any person might recover on a *wagering* policy, by joining with one who had an insurable interest.

2. That the warranty had not been complied with. First, there was no licence for such a *voyage* as this, *viz.* from *New-York* to *St. Bartholomews,* a *Swedish* port. Admiral *Sawyer's* letter gave no protection except to vessels " *bona fide* bound to *Portuguese* or *Spanish* ports." The *Spanish* minister could not enlarge, or vary, the licence. Secondly, the *cargo* of the *Charles* was not such as to come within the purview of the licence, and of course the vessel was not protected by it. The licence extended only to vessels " laden with flour, and other dry provisions." This vessel was laden with " beef, pork and candles," as well as with " flour." The case of the *Jonge Arend,* 5 *Rob.* 19. shews with what

strictness a licence must be pursued. Thirdly, in addition to these objections, the licence was not proved by *legal evidence*. The best evidence would have been an original passport from Admiral *Sawyer*. If a proper foundation were laid for admitting secondary evidence, the terms of such passport and its genuineness might be proved by witnesses. In this case, the original was not proved to be lost or destroyed. The only evidence of its contents, was a paper, certified by the *Spanish* minister to be a copy. This was not *an office copy*, and is entitled to no more credit in a court of justice than the certificate of any private person. The witness who testified on the trial, had never seen an original passport of Admiral *Sawyer*, which he knew to be genuine. But admitting the paper on board the *Charles* to have been a genuine passport from Admiral *Sawyer*, the best evidence even of *that* was not given. It ought to have been produced, or its non-production sufficiently accounted for; which was not done.

3. That the voyage in question, under a licence from Admiral *Sawyer*, was illegal; and the policy, being a contract of indemnity against the risks of such a voyage, is also illegal, and void. The licence was granted, not merely with a view to protect this vessel and cargo from capture, but to promote the interests of the enemy. The trade which it authorized, was regarded by Admiral *Sawyer*, " as being of the greatest importance to the best interests of *Great-Britain*" as well as " those of his Catholic Majesty." There is no difference, in effect, between this licence and one to trade directly with the enemy. *The Julia*, 1 *Story's Dec.* 594. S. C. affirmed on appeal, in the Supreme Court of the *United States, Wheaton on Captures* 159. *The Hiram, Id.* 165. *The Aurora, Id.* 168.

*T. S. Williams* and *Staples*, for the plaintiffs, contended, 1. That they had shewn a sufficient interest in themselves to prevent this being a wagering policy. The plaintiffs are the persons with whom the defendants contracted; they were jointly concerned in fitting out the ship; and were, at the time, in possession as owners. These facts are sufficient *prima facie* evidence of ownership. *Thomas & al.* v. *Foyle*, 5 *Esp. Rep.* 88. *Robertson & al.* v. *French*, 4 *East*, 130. 136, 7. At any rate, such of the plaintiffs as were indispu-

*Hartford,*
June, 1816.

Bulkley
*v.*
Derby
Fishing
Company.

*Hartford,*
June, 1816.

Bulkley
*v.*
Derby
Fishing
Company.

tably owners, may be considered as trustees for all. *Oliver* v. *Greene,* 3 *Mass. Rep.* 133. 137.

2. That the plaintiffs have shewn a compliance with the warranty; which was, that " the ship should be furnished with a passport from Admiral *Sawyer* in the usual form." Both parties must be supposed to have known what such a passport was. The witness swore, that he saw a passport from Admiral *Sawyer* on board; he described it; shewed a copy of it; and then said, that he had seen several, and knew that this was in the usual form. The ship, then, had precisely what the plaintiffs contracted she should have. The kind of evidence, by which this instrument was proved, was the best, which, under the circumstances, could be had. Its genuineness was recognized by the *British* cruisers, to whom it was addressed.

3. That the acceptance of this licence did not render the voyage illegal. The doctrine that even a trading with the enemy is illegal, has not always been assented to without hesitation. Lord *Mansfield* said, he knew no cases that prohibit a subject trading with an enemy, except two; one of which was a short note in *Roll. Abr.* and the other a case in which it was held to be a misdemeanour to carry *corn* to the enemy. *Gist* v. *Mason,* 1 *Term Rep.* 85. But, at any rate, to render the voyage illegal, there must be *a trading with the enemy.* A belligerent may lawfully trade with the subjects of a *neutral* state; although the enemy may incidentally derive a benefit thereby. *The Liverpool Packet,* 1 *Story's Dec.* 513. 525. *The Vrow Elizabeth,* 5 *Rob.* 10. *Jenks & al.* v. *Hallet* and *Bowne,* 1 *Caines' Rep.* 60. 65. *Hallet* and *Bowne* v. *Jenks & al.* in error, 1 *Caines' Ca.* 43. S. C. in Supreme Court of the *United States,* 3 *Cranch* 210. *The United States* v. *The Schooner Matilda,* 4 *Hall's Amer. Law Journ.* 478. The question on which the cases of trading with a neutral, under a licence from the enemy, turn, is, whether the voyage was designed, by the licensees, to aid the enemy.

SWIFT, Ch. J. It appears that two of the plaintiffs were owners of the vessel insured; and that the plaintiffs were all in a copartnership and owners of the cargo. This is a sufficient interest in them to enable them to maintain an action on the policy.

*Hartford*,
June, 1816.
Bulkley
*v.*
Derby
Fishing
Company.

In respect to Admiral *Sawyer's* licence, a witness testifies that he saw on board the vessel a licence purporting to be *Sawyer's* licence; that he had seen a number of them; and that this was in usual form. This writing need not be proved as a written instrument: it may be proved like any other matter of fact, or any other thing required to be on board the vessel. I am therefore of opinion, there is sufficient evidence that the vessel insured had on board a licence from Admiral *Sawyer*.

But the material question is, whether the licence from Admiral *Sawyer* did not render the voyage illegal, and vacate the policy.

It is indisputable, that all trading or private intercourse with the enemy is unlawful; and that all contracts founded thereon are void. If a licence had been obtained by the plaintiffs directly from the enemy, it would have rendered the voyage illegal. But here was no intercourse or contract with them: the voyage was fairly intended to a neutral port, and was lawful. There was no agreement to procure a licence from the enemy. It was obtained by a public minister of the neutral nation to whose territories the voyage was intended. It is opposed to no principle of policy to admit an application to a neutral power, to obtain a protection, for a neutral voyage, from a belligerent power. There is no rule of the law of nations prohibiting it, and there never has been a decision that a voyage thus protected was illegal: of course, the licence cannot render the policy void.

The fair construction of the warranty contained in the policy with respect to the licence, is, that a licence from Admiral *Sawyer* should be furnished of such form as should purport to be a protection of the vessel and cargo for the voyage. It would be unreasonable to say, that the plaintiffs might put on board a cargo which would defeat the effect of the licence. It appears that the licence was for a cargo of *dry provisions*; and the cargo in the vessel insured consisted *both of wet and dry* provisions. This would be no compliance with the warranty, unless it could be further shewn, that there was no other form of licence from Admiral *Sawyer*, and that the usage of merchants, and the understanding of the parties, was, that such licence was the only one required, whatever might be the cargo, or that the insurers had knowledge of the cargo put on board the vessel. On this

*Hartford*,
June, 1816.

Bulkley
*v.*
Derby
Fishing
Company.

ground, the plaintiffs are not entitled to recover, without further proof.

In this opinion TRUMBULL, EDMOND, SMITH, BRAINARD and GODDARD, Js. concurred.

HOSMER, J.  There is no controversy, at the present day, concerning what shall amount to an insurable interest. Not only the absolute owner may legally have the indemnity of a policy, but he who has merely a qualified property. The trustee may insure ; and so may the *cestui que trust.* Even a reasonable expectation of profit will constitute that sort of interest which may be protected by an insurance.  1 *Marsh. Ins.* 105. 107. (*Condy's edit.*)

What shall amount to the proof of an insurable interest, is equally well established.

Documents, evincing the property of the ship or cargo to be in the insured, undoubtedly constitute the best evidence. If this species of proof is deficient, the deficiency may be supplied by parol testimony.  The exercising acts of ownership in directing the loading, &c. of the ship, and paying the people employed, is adequate evidence of property in the ship. In short, *" the mere fact of possession as owners* is *prima facie* evidence of ownership, without the aid of any documentary proof or title deeds on the subject, until such further evidence should be rendered necessary in support of the *prima facie* case of ownership made, in consequence of the adduction of some contrary proof on the other side."  *Robertson & al.* v. *French,* 4 *East* 136, 7.  *Amery* v. *Rogers,* 1 *Esp.* 208. *M'Andrew* v. *Bell,* 1 *Esp.* 373.  It is almost superfluous to add, that in this case, the plaintiffs have adduced sufficient proof of an insurable interest.

It has been objected by the defendants, that a passport, commonly called " Admiral *Sawyer's* licence," was on board the ship insured ; and that this rendered the voyage illegal, and annulled the policy.

The proof by law required to establish the existence of the licence, admits of no question.  In this, as in every other instance, the best evidence the nature of the case allows, is indispensable.  A paper having been on board the ship, purporting to be a licence, infers no presumption of its own authenticity.  Even as to the complete and genuine

papers with which every ship *must* be provided, the master should be acquainted with their truth, and capable of verifying them on oath. But, in respect of a document, not ordinarily found on board of ships, and making no part of their usual muniments, strict proof should be required. The established rules of evidence demand, that the seal of Don *Onis* should be verified by some witness who saw him affix it to the licence, or who knows it to be his seal. It is not judicially known. Even a judgment obtained in the island of *Grenada*, certified by the judge of the court, and whose hand-writing was proved, was held not to be established, because the seal of the island affixed to it, had not been verified by testimony. *Henry* v. *Adey*, 3 *East* 221. What is more to the purpose, the seal of Don *Onis*, like that of every other individual, must be established by the evidence of witnesses. If he is viewed as a public character, his seal must be proved, because it is not by law recognized, and can only be evinced like every other fact. The witness must be capable of testifying, not merely that he has seen many similar papers, which were called *Sawyer's* licences, but that he knows the seal by which the licence is authenticated.

The testimony of *Miller*, if believed, establishes the existence of the licence, as having been " under the seal of the *Spanish* minister," and that it was on board the ship, at the time of her capture. He further testifies, that it was taken, and has been withheld by the captors. This fact shows, that the paper is inaccessible, and that parol evidence is the best proof, of which it is susceptible.

If the licence rendered the voyage illegal, there exists no doubt, that the policy made to protect the insured, is void. The illegality of the transaction is the sole point, on which this part of the case depends.

It is incontestibly established, that all commercial intercourse with a public enemy is unlawful. *Potts* v. *Bell*, 8 *Term Rep.* 548. *The Brig Joseph*, 1 *Story's Dec.* 545. It is equally clear, that trade to a neutral port is not illegal, although the enemy may derive benefit from it, unless it be carried on in connexion with, or subservient to, her interests. *The Ship Liverpool Packet*, 1 *Story's Dec.* 513. An *American* ship, however, destined to *Spain* and *Portugal*, with provisions, *for the use of the allied armies on the peninsula*, sailing under a licence obtained from the public enemy, was

*Hartford*, June, 1816.

Bulkley *v.* Derby Fishing Company.

*Hartford,*
*June, 1816.*

Bulkley
*v.*
Derby
Fishing
Company.

most justly condemned. *The Julia,* 1 *Story's Dec.* 594. The licence made no essential difference. The supplying the enemy with articles of necessary sustenance, was a high offence, and incapable of vindication.

I readily admit, that a licence obtained, through a neutral, from the public enemy, may either *per se,* or in connexion with the circumstances accompanying, furnish conclusive, or presumptive, evidence of an illegal transaction. I think it is equally apparent, that the voyage, the cargo, the place of destination, the passport, and every attendant fact, may convince the mind, that the only object of the merchant, was to obtain protection in the fair pursuit of neutral trade. Considerations of this nature are always open to the court, who will pronounce on the real intent of the transaction.

The great question yet remains, whether a licence obtained through a neutral, from the public enemy, *per se* renders the voyage illegal. I put out of the case, every thing which has been said, relative to the sailing *under the flag* of the enemy. *The Vrow Elizabeth,* 1 *Rob.* 10. The flag is an essential characteristic of property, and equivalent to the most explicit declarations on that subject.

It never has been legally determined, that a voyage is made unlawful *merely and exclusively* from there being an enemy's licence on board a ship, destined for a neutral port. I am well aware of the *obiter* opinion, expressed by the learned Judge, in the case of the *Julia ;* but as it was not called for in that action, it possesses no legal authority. At the same time, a respectful deference for sentiments emanating from so high a source, if unopposed, would impair the confidence I should otherwise have in my own. But in the case of the *Matilda,* 4 *Hall's Amer. Law Journal,* p. 478. 487. it was decided by the Chief Justice of the *U. S.* that the licence of a public enemy, did not, *of itself,* render the voyage illegal. The usage of merchants on this subject, the silence of courts, and the recent determination alluded to, require urgent arguments to evince, that a voyage is rendered illegal, merely from there being an enemy's licence on shipboard. Those which have been relied on, I will briefly examine.

It has been said, that licences being the subjects of purchase, increase the resources of the enemy. This remark, if it presented a full view of the case, would be among those *small things,* which rather tend to shew the weakness than force of

*Hartford*, June, 1816.

Bulkley *v.* Derby Fishing Company.

the argument. But, the truth is, it exhibits a small part of it only. The resources of our country, through the protection afforded by licences, may be much enlarged ; the commodities which the public exigencies demand, acquired ; the produce perishing on hand, disposed of ; and the national wealth augmented. By adding a trifle to the resources of the enemy, we, perhaps, quadruple our own. " The sound maxim of policy," (says a great Judge) " is this, *that a greater evil should be avoided for a less, and a less good should give way to a greater.*" 1 *Cowp.* 6.

It has been argued, that the procurement of licences from the public enemy produces an intercourse with him, which may be abused to the worst purposes. Without stopping to examine by the balance this observation, the amount of which is not easily ascertained, it suffices to remark, that it is entirely inapplicable to the purchase of a licence from a friendly neutral. In the latter case, *there is no intercourse with an enemy.*

It has been contended, that if a licence is granted by an enemy, as a measure of policy, to obtain a supply of the necessaries of life, it would be exceptionable to sail under its protection. I admit the justice of the remark, if these facts are superadded ; that an individual contracts to supply the enemy, and resorts to this mode of shelter from molestation. But, suppose the enemy, prompted by selfish views, were, by a general law, to sanction neutral trade, or by the hands of a neutral friend, were profusely to scatter their licences ; would it be *within the jurisdiction of courts,* to balance the arguments of national policy for and against commerce, and to act in conformity with the result ? I am of opinion it would not, and my reasons will be stated in a subsequent part of the argument.

It has been said, that a licence granted implies an agreement that it shall not be employed to the injury of the grantor, and that all hostility with him shall be avoided. Hence, that the *American* citizen must be *neutral* on the ocean, while his country is at war. The objection implied in this remark, lies against a general permission by the enemy to trade with neutrals. The neutrality of the merchant on the ocean is implied, and such will be the fact. The persons making the objection admit, that neutral commerce would not be affected, by the general permission abovementioned. But, why should

*Hartford,*
June, 1816.

Bulkley
*v.*
Derby
Fishing
Company.

importance be given to an an argument of so little force ? *The business of a merchant ship is commerce, and not battle.* The benefits derived from commerce, equally with those accruing from agriculture and manufactures, abundantly compensate the nation, for the few hands which are not permitted to wield the sword.

The subject, when stripped of all the covering, which plausible argument and specious eloquence may put upon it, rests on this narrow ground. *Commercial intercourse with an enemy, directly or indirectly, is unlawful.* An enemy's licence to trade, with accompanying circumstances, *may furnish satisfactory proof of illicit commerce, on the fairest presumption of a bona fide neutral trade.* Hence, a licence *of itself,* if nothing on the face of it tends to a different conclusion, *implies no demonstration of illegal views.* The enquiry always, from the very nature of the thing, must be, *a question of fact.* If the court is satisfied, that *a fair neutral intercourse* was intended, the transaction will be considered as legal ; if a trading with the enemy, as unwarrantable.

Finally, the question whether a licence to trade shall render a voyage illegal, embraces the highest political interests of the country. Prohibiting the use of it, pertains peculiarly to that legislature, with which such interests are specially confided. The wants of the country, may render the protection of licences of the highest importance ; and the enlightened statesman may see, that from the " seeming evil" of them much good is educed. On the other hand, it may be equally apparent to him, that under the existing state of things, they are productive of little advantage, and much positive mischief. To the national legislature, then, it belongs, on principles of political expediency, to prohibit licences, when they are detrimental to the country. But, the judiciaries, in my judgment, have no jurisdiction to decide upon a question so peculiarly of legislative cognizance. The late act of Congress, 12th vol. p. 225. by forbidding the sailing under a licence from the public enemy *in future,* comports with the opinion I have expressed.

One enquiry yet remains. The policy of insurance, on the face of it, has a warranty by the insured, in these words ; " Warranting her to be furnished with a passport from Admiral *Sawyer in the usual form."* The cargo of the

ship *Charles*, consisted *of wet* and *dry provisions*. The licence alone purported to protect *American* vessels, loaded with *dry provisions only*. What, then, is the construction of the warranty, and what its effect?

*Hartford,*
June, 1816.

Bulkley
*v.*
Derby
Fishing
Company.

A warranty, like every other part of a policy, must be construed according to the understanding of merchants, and does not bind beyond the commercial import of the terms. 1 *Marsh. Ins.* 347. *a. (Condy's* edit.) In this case, the warranty can mean no less than this; that a genuine *Sawyer's* licence, purporting to cover *the voyage and cargo* insured, shall be on board the ship. Security from capture by *British* cruisers, so far as that was attainable by a passport from Admiral *Sawyer*, was the undoubted object of the contracting parties. But, the licence proved imported no security, and conferred no protection. A comparison of the ship's cargo with the licence, by the commander of a cruiser, would furnish testimony infallible, that the property was unprotected. "If a ship, for want of a necessary document, merely subject herself to be carried into the port of a belligerent, she falsifies the warranty." 1 *Marshall*, 321. It was the stipulation of the insured, and nothing short of it could be intended, *that the ship should be protected* by the licence; and this necessarily implies a protection of every part of the cargo. The proof exhibited shows a noncompliance with the warranty.

It clearly results, that the policy never was obligatory on the insurers. 1 *Marsh. Ins.* 346. *a.* 347. *a.* 348. *Cowp.* 787. If the insured were prevented from obtaining a licence covering the cargo, by an *utter impossibility*, it is their misfortune, but imposes on the underwriters no additional obligation. *The contract is the standard*, by which the rights of the parties are to be estimated. *Co. Litt.* 206. 2 *Black. Comm.* 154. 157. 1 *Marsh. Ins.* ub. sup.

GOULD, J. As the case is presented to the court, there is one particular, in which I think the warranty has not been complied with. I refer to the cargo's not corresponding with the licence. Upon the other points, urged for the defendants, it is not necessary to decide; though, as at present advised, I do not perceive, that the case is embarrassed by any of them. It is true, that the intended cargo is not described, either in the warranty, or the policy. But,

*Hartford,*
*June, 1816.*

Bulkley
*v.*
Derby
Fishing
Company.

in my judgment, a warranty, that the ship shall be furnished with a pass, or licence, (the object of which is certainly the protection of a cargo of *some* kind,) implies *prima facie,* at least, that the document shall be such, as shall *import* to protect the cargo, that may be put on board. And this implication must, of course, prevail, unless it be rebutted, as, perhaps, it might be, by some general usage of trade, or some special agreement, or understanding of the parties, to the contrary. In the present case, nothing of this kind appears; and the pass extends, in its terms, only to *flour, and other dry provisions:* whereas the cargo actually consisted, not of those articles only, but of many others also, of an entirely different description. It is manifest, then, that the licence, supposing it to have been genuine, and authoritative, would not, according to the terms of it, have secured *this* cargo from capture; in which event the ship also would be liable, of course, to condemnation. But, whether, in any case, the risk is actually increased, or not, by a breach of warranty, is not material. The stipulation is in nature of a condition precedent, and must be strictly complied with. And as this does not appear to me, from the facts before the court, to have been done, in the present instance; the plaintiffs have failed, in my opinion, to establish a right of recovery.

BALDWIN, J. being interested in the cause, gave no opinion.

Another trial to be had for further proof.

NOTE. The following cases in the Supreme Court of the *United States,* referred to by the counsel for the defendants, *ante* p. 575. have since been reported at length, *viz. The Julia,* in 8 *Cranch* 181.; *The Hiram,* in 8 *Cranch* 444.; and *The Aurora,* in 8 *Cranch* 203.